# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
May 08, 2020
/s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The cellular device assigned call number<br>(213) 700-0559, more fully described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)     Case No.     20 MJ 126 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☑ evidence of a crime;

   ☐ contraband, fruits of crime, or other items illegally possessed;

   ☐ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | distribution of and conspiracy to distribute a controlled substance |
| 21 U.S.C. § 843(b); 18 U.S.C. | unlawful use of communications facilities; laundering of monetary instruments & |
| §§ 1956 &1957; 18 U.S.C. § 2 | conspiracy to do so; aiding and abetting the aforementioned offenses |

The application is based on these facts:

See attached affidavit

   ☐ Continued on the attached sheet.

   ☑ Delayed notice of _180_ days *(give exact ending date if more than 30 days:* _12/07/2020_ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nathan Plennes, TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone and email _____ *(specify reliable electronic means).*

Date:    May 8, 2020

_____
*Judge's signature*

City and state:   Milwaukee, WI

William E. Duffin
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nathan Plennes, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers:

> **(213) 700-0559** (the "**0559 Phone**"), having subscriber "Louis R. Perez" and believed to be used by Julian SANCHEZ, and whose service provider is Verizon Wireless, a wireless telephone service provider headquartered in Bedminster, New Jersey; and

> **(562) 380-9506** (the "**9506 Phone**"), having no subscriber listed and believed to be used by Julian SANCHEZ, and whose service provider is T-Mobile, (the "Service Provider") a wireless telephone service provider headquartered in Parsippany, New Jersey.

Verizon Wireless and T-Mobile will be referred to as the "Service Provider." The **0559 Phone** and the **9506 Phone** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     I am a state certified law enforcement officer employed as a Detective with the Waukesha County Sheriff's Department and have been a law enforcement officer for over ten years.  I have been a Detective for almost six years and have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over three years.   I was previously assigned to the Waukesha County Metropolitan Drug Enforcement Group as a Deputy Sheriff for 11 months.  I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement

1

Administration (DEA), and have been since August 2016. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.     I have participated in numerous complex narcotics investigations that involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a.     I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.     I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c.     I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of

2

numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

    d.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

    e.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

    f.  I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

    g.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

    h.  I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

    i.  I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking; and

    j.  I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers

3

often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

4.     The facts in this affidavit come my personal observations, my training and experience, my review of documents, and information obtained from other law enforcement agents and witnesses.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1), 843, and 846, and 18 U.S.C. §§ 1956 and 1957 have been committed, are being committed, and will be committed by LOUIS R. PEREZ III, LOUIS PEREZ JR., XINA YANG and JULIAN SANCHEZ. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

6.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

4

## PROBABLE CAUSE

**A.      Summary of Investigation**

7.      In September 2018, HIDTA DEA initiated an investigation into individuals distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin. HIDTA identified the individual orchestrating the DTO as LOUIS R. PEREZ III (PEREZ III). The investigation has revealed that PEREZ III obtains large quantities of cocaine, heroin, and marijuana from unknown source(s)-of-supply in or near California, and from the Milwaukee, Wisconsin area, which is then distributed in the Milwaukee area. The investigation has further revealed that XINA YANG (XINA) and others, are facilitating the PEREZ III DTO by regularly making travel, lodging, and other arrangements for the DTO and by financially assisting the DTO. To date, the investigation has also revealed the following:

8.      The DTO has used couriers to bring cocaine from the west coast of the United States to Milwaukee, Wisconsin, and money from Milwaukee to the west coast;

9.      In ████████████ pursuant to an order authorized in ████████████ ████ PEREZ III was intercepted engaging in drug-related communications with a source of information (SOI), SOI #1. SOI #1, upon arrest, admitted to supplying PEREZ III with kilogram quantities of cocaine throughout 2018 and 2019. SOI #1 described SOI #1 as a "back up supplier" to PEREZ III;

10.      Bank account records from 2017 through 2019 for PEREZ III and XINA reflect frequent and often high-level cash deposits and withdrawals in

5

geographically disparate areas to include Milwaukee and California locations, and are consistently travel-related;

11.     Travel records, bank account information, and telephone location data reflect that between June 2019 and November 2019, PEREZ III and XINA frequently travelled between Milwaukee, Wisconsin, and California, particularly the northern California and Los Angeles, California areas. The northern California areas in which PEREZ III and XINA appear to frequent based upon positional data from their telephones are areas that are known by law enforcement to be the location of large-scale marijuana grow and distribution operations;

12.     Despite frequent travel to California and numerous cash deposits in their bank accounts, to date, case agents have been unable to identify any legitimately earned income on behalf of either PEREZ III or XINA;

13.     Since at least mid-March 2020, the PEREZ III DTO has been receiving packages containing suspected controlled substances at various residences throughout the City of Milwaukee; and

14.     Since December 2019, PEREZ III has been shipping parcels containing suspected bulk currency to JULIAN SANCHEZ in California, using aliases and sender addresses not associated with PEREZ III. This has been confirmed by positional data, U.S. Postal Service records and video surveillance, and the execution of two sneak and peak warrants on April 16, 2020, which revealed PEREZ III mailed $40,000 U.S. Currency to SANCHEZ.

6

**B.** **Eight kilograms of cocaine seized from PEREZ JR. while driving from California to Wisconsin.**

15.     On September, 25, 2018, PEREZ III, XINA, and PEREZ JR. were driving from California to Wisconsin. PEREZ JR. was driving a Ford F-150 truck, while PEREZ III, with XINA as a passenger, was driving a Chevrolet Suburban with California plates. At approximately 2:47 a.m., PEREZ JR. was stopped by Utah Highway Patrol because his truck's registration plate did not return to the truck. While stopped, PEREZ III called PEREZ JR., and PEREZ JR. asked PEREZ III to wait for him at the next exit.

16.     A K-9 alerted on PEREZ JR.'s truck, which PEREZ JR. gave officers consent to search. A subsequent search of PEREZ JR.'s truck revealed a hidden hydraulic compartment in the rear seat area, which contained eight packages of cocaine wrapped in plastic wrap, totaling eight kilograms. PEREZ JR. denied knowing there was cocaine in his truck.

17.     PEREZ JR. was arrested for Possession with Intent to Deliver Cocaine, and he subsequently provided conflicting information in a post-arrest Mirandized interview. He stated that he had been in California, whereas previously he told arresting officers he had been in Las Vegas. PEREZ JR. further stated that PEREZ III and XINA drove with him in the truck from Milwaukee to California, but PEREZ III and XINA rented a truck in California because they did not want to make the return trip to Milwaukee "inconvenient" for PEREZ JR. PEREZ JR. was released on bail after his interview. On September 25, 2018, PEREZ JR., PEREZ III, and XINA

7

departed Los Angeles, California, on the same American Airlines flight, which arrived at Chicago O'Hare airport in the early morning hours on September 26, 2018.

18.     Hotel records reflect that on September 21, 2018, XINA rented two rooms at a Best Western in Indio, California, through September 25, 2018. XINA provided PEREZ JR.'s address, and it appeared as though PEREZ III signed the rental agreements for both rooms. The room charges were paid for with cash and a credit card. XINA also booked all of the return flights on September 25, 2018, using her Wells Fargo Bank debit card, after she received a $2,000 deposit into her Wells Fargo bank account at a branch location in St. George, Utah.

19.     Additionally, on September 21, 2018, PEREZ III and PEREZ JR. activated two pre-paid phones, with which they used to communicate until PEREZ JR. was stopped with eight kilograms of cocaine. PEREZ JR.'s prepaid phone was located in his truck, next to his "personal" phone. A review of the download of PEREZ JR.'s prepaid phone identified the only listed contact as "L." When PEREZ JR. was arrested, he stated that PEREZ III purchased the prepaid phone on September 21, 2018, using an unknown subscriber, and that he used it only for the GPS feature. Notably, the day after this traffic stop, PEREZ III cancelled a phone number that he had activated on July 26, 2017, and established a new number.

20.     Based on my training, experience, and knowledge of this investigation, I believe that PEREZ III and XINA owned the eight kilograms of cocaine seized on September 25, 2018, in Utah. I further believe that this seizure evidences that the

PEREZ III DTO transported kilogram quantities of cocaine from California to Wisconsin.

**C.  $99,970 seized from MARY while driving from Milwaukee to California.**

21.  On August 28, 2019, at approximately 4:24 p.m., MARY was driving a van through Wyoming when she was stopped by a highway patrol trooper for speeding. The trooper detected a strong odor of marijuana emanating from the interior of the van. After a narcotics detection canine indicated on the passenger side of the van, the van was searched, which search revealed two partially burned marijuana cigarettes in the center console, marijuana "shake" on the front passenger seat, $4,000 in a fanny pack, and nine bundles of suspected bulk currency, totaling $99,970, in the driver's side stow-n-go compartment under a dog kennel with three dogs inside. The bundles were tightly wrapped in black electrical tape. MARY denied any knowledge of the nine bundles of currency, claimed ownership of the currency in the fanny pack, and stated that she was driving from Milwaukee to Fresno, California, to visit her mother for two days. MARY was arrested for possession of marijuana.

22.  A toll analysis revealed that PEREZ III, using a predecessor telephone number, was in contact with MARY's telephone number eight times on the day she was traffic stopped with suspected bulk currency. MARY's cell phone was lawfully searched, which search revealed that beginning on August 26, 2019, MARY and XINA, using a predecessor phone number, discussed the rental of the van, and

XINA asked MARY if MARY took the cost of the van "out of my money." On September 25, 2019, PEREZ III and XINA stopped using the phone numbers used to contact MARY on the day she was arrested. PEREZ III and XINA subsequently established new phones numbers.

23.    Based on my training, experience, and knowledge of this investigation, I believe that the $99,970 found in a compartment in MARY's vehicle was bulk currency that MARY was transporting for PEREZ III to California to pay for controlled substances.

**D.    SOI #1 arrested and admits supplying PEREZ III with cocaine.**

24.    On ▅▅▅▅▅▅▅▅ a federal search warrant was executed at ▅Redacted▅ ▅Redacted▅ Milwaukee, Wisconsin, the residence of SOI #1.  During the course of the search, agents located the following: $12,000 in U.S. Currency, a rifle with an extended magazine, a pistol, thirteen cellular telephones, a money counter, packaging materials including bags, scales, rubber gloves, and a vacuum sealer, and approximately 500 grams of cocaine. SOI #1 was arrested this same day for

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

25.    SOI #1 made statements against SOI #1's penal interest. ▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

# Redacted

▅Redacted▅ ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

10

_____ Thus far, the information provided by SOI #1 has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases, _____ _____ Within the context of the information detailed and relied upon for purposes of this application, law enforcement believes that SOI #1 is credible and SOI #1's information is reliable.

26.     SOI #1 identified PEREZ III by photograph and stated that upon meeting PEREZ III approximately 1.5 to 2 years before SOI #1's arrest, SOI #1 supplied PEREZ III with approximately 10 kilograms of cocaine per week, and SOI #1 supplied PEREZ III with one kilogram of heroin around February or March of 2019. SOI #1 stated that PEREZ III paid approximately $30,000 for a kilogram of cocaine and approximately $46,000 for a kilogram of heroin, and PEREZ III always paid SOI #1 in cash. According to SOI #1, SOI #1 was PEREZ III's "back up supplier," and that PEREZ III had an additional kilogram-level cocaine source of supply in California and Milwaukee. But SOI #1 did not know how PEREZ III was getting the cocaine from Milwaukee to California since PEREZ JR. was arrested. According to SOI #1, PEREZ III told SOI #1 that even though the kilograms of cocaine cost more in Milwaukee than they do in California, it was sometimes easier and less risky for PEREZ III to obtain the cocaine in Milwaukee. Additionally, SOI #1 stated that PEREZ III told SOI #1 that PEREZ III's heroin supplier was in Milwaukee.

11

27.     SOI #1 further stated that PEREZ III brings approximately 800-1,000 pounds of high-grade marijuana to Milwaukee from California each month for distribution in the Milwaukee area. PEREZ III also sells "vape pens" containing THC in the Milwaukee area.  PEREZ III told SOI #1 that PEREZ III makes more money selling marijuana than cocaine or heroin. PEREZ III told SOI #1 that PEREZ III obtained the marijuana from "Asians" in the Sacramento, California area.

28.     According to SOI #1, a few days before SOI #1 was arrested, PEREZ III contacted SOI #1 and requested seven kilograms of cocaine, but SOI #1 did not have any.  SOI #1 stated PEREZ III said that he would go to his "other guy," even though PEREZ III liked the quality of SOI #1's cocaine.

29.     SOI #1 dealt solely with PEREZ III, who never brought anyone with him to conduct drug transactions with SOI #1. SOI #1 never met any of PEREZ III's customers either. According to SOI #1, PEREZ III told SOI #1 that PEREZ III had two "stash houses" in Milwaukee, but SOI #1 did not know where those houses were located.

30.     A lawful search of SOI #1's various telephones revealed two telephone numbers identified as predecessor phone numbers for PEREZ III. Both of these telephone numbers were intercepted in the ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ The intercepted calls between SOI #1 and PEREZ III have been interpreted by case agents as drug trafficking related.

## E.    DTO Expenditures and Travel

31.    Based on the investigation to date, I believe that the PEREZ III DTO principally operates in cash. Case agents have examined bank records for some of the TARGET SUBJECTS dating back to January of 2017. This analysis has revealed that between January 27, 2017, and November 6, 2018, a total of $83,800 was deposited into XINA's Wells Fargo bank account ending in x3243, comprised of $71,000 cash and $9,961 in two federal tax refunds. The cash deposits occurred in various cities throughout the United States, including Milwaukee, Wisconsin; Davenport and Miami, Florida; St. George, Utah; and Santa Rosa, California. During this same time-frame, withdrawals from this account totaled $83,772. Further, between April 1, 2019, and November 6, 2019, a total of $50,800 was deposited into XINA's U.S. Bank account ending in x3919, comprised of $38,000 cash and the remainder being PayPal credits and transfers from other bank accounts. The cash deposits occurred in Milwaukee, Wisconsin; and Redding, Palm Springs, and Vallejo, California. The total withdrawals from this account totaled $50,300.

32.    The cash deposits and withdrawals reflected are also significant because (1) XINA's and PEREZ's cash deposits and withdrawals occur in both Milwaukee and various cities in California, thus evidencing PEREZ III and XINA's activities in furtherance of the DTO; (2) activity on PEREZ III and XINA's accounts happens at branch locations in California when flight records place them in Wisconsin and vice versa; (3) in some instances financial activity will occur at

13

branch locations in Wisconsin and California on the same day; (4) the deposit and withdrawal activity often corresponds with flight activity of various TARGET SUBJECTS; and (5) some transactions appear to have been structured.

33.     Pursuant to a Wisconsin Department of Workforce Development query for the years 2018 and 2019, PEREZ III has no legitimate employment record. This is consistent with the daily positional data on his phones. Additionally, the only known social security number for XINA returns results for MARY when queried with the Wisconsin Department of Workforce Development. However, XINA has never been surveilled traveling to or from work, and the daily positional data of her phones is inconsistent with any legitimate employment. Therefore, despite frequent travel to California, as described below, and numerous cash deposits in their bank accounts, to date, case agents have been unable to identify any legitimately earned income on behalf of either PEREZ III or XINA.

34.     Case agents have also examined flight records for many of the TARGET SUBJECTS, which has revealed that XINA and PEREZ III have both paid for SANCHEZ to fly with PEREZ III between airports in Los Angeles, California, and Chicago, Illinois.

35.     Positional data for predecessor telephone numbers associated with PEREZ III and XINA, for various times between June 2019 and January 2020, revealed that PEREZ III and XINA frequently traveled between Wisconsin and California, and between Los Angeles, Vallejo, and northern California. Public databases revealed that XINA was associated with the address of 24 Rose Lane,

14

Vallejo, California. Pacific Gas and Electric records indicate that XINA was the utility subscriber for 24 Rose Lane, Vallejo, California, from May 11, 2018, to September 30, 2019. Based upon their pattern of travel to northern California, which is the hub of marijuana grows, use of unexplained cash, and SOI information, case agents believe that PEREZ III's and XINA's marijuana source of supply is located in the northern California area, and they travel to this area in furtherance of the DTO.

**F.    Title III Wiretap Authorization**

36.    On March 19, 2020, United States District Judge Lynn Adelman issued a court order authorizing the initial interception of wire and electronic communications over (626) 733-6730 (the "6730 Phone"), used by PEREZ III. Interceptions of wire and electronic communications over the 6730 Phone began on March 20, 2020, and ended on April 18, 2020.

37.    On April 10, 2020, United States District Judge Lynn Adelman for the Eastern District of Wisconsin issued an order authorizing the initial interception of wire and electronic communications over (414) 499-1861 (the "1861 Phone"), used by PEREZ III, and telephone number (626) 629-9932 ("the 9932 Phone"), used by XINA. Interceptions of wire and electronic communications over the 1861 and 9932 Phones began on April 10, 2020, and are scheduled to end on May 9, 2020.

38.    On April 24, 2020, United States District Judge Lynn Adelman for the Eastern District of Wisconsin issued an order authorizing the continued interception of wire and electronic communications over the 6730 Phone.

15

Interceptions of wire and electronic communications over the 6730 Phone began on April 24, 2020, and are scheduled to end on May 23, 2020.

### G.  Pierce Street Stash Apartment and Garbage Search

39.     On April 10, 2020, case agents installed a remote camera at the DTO's suspected stash apartment, the Knitting Factory Lofts, located at 2100 W. Pierce Street, Apartment #201, Milwaukee, Wisconsin (the Pierce Street stash apartment). This camera was installed with a view of Apartment #201. On April 11, 2020, the remote camera depicted MANUEL SOTO and an unknown black male enter Apartment #201 at approximately 1:35 p.m. Approximately one hour later, the unknown black male exited Apartment #201 carrying two large black garbage bags, and SOTO was observed in the doorway of the apartment.  Then, SOTO and the black male re-entered and exited the apartment several more times over the next few minutes carrying large black garbage bags and flattened cardboard boxes. At approximately 4:00 p.m., case agents observed SOTO, the unknown black male, ANTONIO RODRIGUEZ, and a female believed to be RODRIGUEZ's girlfriend, exit Apartment #201 via the remote camera.

40.     In the early morning hours of April 11, 2020, case agents obtained six large black garbage bags from the dumpster in the parking lot associated with the Pierce Street stash apartment. An examination of the bags revealed that two of the bags were unrelated to Apartment #201 based upon the discarded mail located within the bags. Case agents believe that the remaining four bags are associated with Apartment # 201 due to the fact that they were the only other black garbage

16

bags in the dumpsters at the time the bags were retrieved. Case agents recovered a total of 498 "Shield N Seal" brand vacuum sealed bags that had the odor of marijuana. Based on training and experience, case agents know that the bags recovered from the garbage are commonly used to transport marijuana and each individual bag holds approximately one pound of marijuana when full. Further, case agents observed that the insides of each of the bags were wet and appeared to have been rinsed out to rid the bags of any residue.

41. Based on my training, experience, and knowledge of this investigation, I believe that the PEREZ DTO is using 2100 W. Pierce Street, Apartment #201, Milwaukee, Wisconsin as a stash location. Furthermore, remote surveillance and positional cell phone data reflect PEREZ III and XINA frequenting the Pierce Street stash apartment. Remote surveillance and interceptions over PEREZ III's and XINA's telephones further reflect that other DTO members have access to the Pierce Street stash apartment, to include SOTO, RODRIGUEZ, and several other unidentified individuals.

**H.    DTO Receiving Controlled Substances Via Shipping Companies**

42. Court authorized intercepted communications and contemporaneous surveillance of DTO members has revealed that PEREZ III is coordinating the shipment of packages containing suspected controlled substances to various DTO associate residences in Milwaukee, Wisconsin.

43. More specifically, since approximately March 23, 2020, the PEREZ III DTO has received at least 50 packages, which have been delivered by Fed Ex, DHL,

17

and UPS to at least eight different addresses. These addresses include but are not limited to 170 W. Crawford Avenue, Milwaukee, Wisconsin (residence of JOSE ALVARADO); 2257 S. 30th Street, Milwaukee, Wisconsin (residence of MERCEDES HERBERT GONZALEZ); 3624 W. Burnham Street, Milwaukee, Wisconsin (residence of MA YANG); 3344 S. 17th Street, Milwaukee, Wisconsin (residence of MICHELE HART and ALEXANDER HART ROBLES); 3403 S. 18th Street, Milwaukee, Wisconsin (residence of unknown occupant); 3920 S. 2nd Street, Milwaukee, Wisconsin (residence of CARLOS VENEGAS LOPEZ); 420 E. Morgan Avenue, Milwaukee, Wisconsin (residence of LOUIS PEREZ JR.); and 3130A S. 49th Street, Milwaukee, Wisconsin (residence of unknown occupant). Furthermore, intercepted communications reflect that the DTO associates know of and are assisting PEREZ III in receiving packages at their residences. Intercepted communications, pen register information, and surveillance have also established that XINA facilitates delivery of some of the packages to MA YANG and MARY YANG. Finally, based on physical surveillance, most of the packages received by the PEREZ III DTO appear to be transported primarily to PEREZ JR.'s residence (420 E. Morgan Avenue), the Pierce Street stash apartment, and MARY YANG's residence (4748 N. 49th Street).

44. With respect to the FedEx packages, (1) PEREZ III routinely tracked many of these packages on his cell phone and expressed concern for some of the packages' whereabouts when they did not arrive in a timeframe that he expected, which was reflected in intercepted communications with Fed Ex; (2) interceptions

established that PEREZ III coordinated the delivery and retrieval of the packages among the DTO members; (3) based on surveillance, the DTO uses multiple members, vehicles, and counter surveillance techniques to retrieve packages from the various addresses in Milwaukee, Wisconsin; (4) at least some of the packages were in the name of aliases; and (5) upon receipt of at least one of the packages, PEREZ III, using the 6730 Phone, called SANCHEZ, using (707) 888-2991 (the "2991 Phone") to confirm receipt. Based on my training, experience, and knowledge of this investigation, I believe that the FedEx packages contained a large quantity of controlled substances because of the above-described ways in which PEREZ III distanced himself from these packages.

45.     In early April 2020, DHL opened five packages that arrived to its facility from Hong Kong and that were destined for PEREZ JR.'s residence, VENEGAS LOPEZ's residence, and HART and HART ROBLES' residence.  Because the packages were sent internationally, Customs and Border Patrol (CBP) opened the packages to examine their contents. Each package contained hundreds of empty boxes for cartridges. According to CBP, the types of boxes for cartridges contained in the packages are commonly used to consume THC oil through "vaping."  All packages were ultimately delivered to the respective residences.

46.     Based upon the DHL packages containing vape cartridge boxes, SOI #1's information, and information gleaned from the investigation to date, I believe that the PEREZ III DTO manufactures and distributes "vape cartridges" containing THC oil in the Milwaukee area. Additionally, within the iCloud search warrant for

19

PEREZ III's iCloud account was an email, dated October 19, 2019, from PEREZ III and XINA's landlord, who was concerned about drug activity occurring at 24 Rose Lane, Vallejo, California, a residence PEREZ III and XINA were renting at the time. Attached to this email was a photograph depicting a "Shark 710" oil filling machine. Research indicates that the "Shark 710" machine is marketed to the Cannabis and CBD oil market and costs between $13,000 and $15,000. The machine is fully automated and is capable of filling 100 cartridges in an average of 30 seconds.

47. To date, case agents estimate based on the number of DHL boxes received by the PEREZ III DTO that the DTO has received at least 12,000 vape cartridge boxes and empty vape pens from DHL shipments. Furthermore, based on surveillance and court authorized intercepted communications, I believe that MARY is assisting the PEREZ III DTO with the manufacture of the vape cartridges at her residence at 4748 N. 49th Street, Milwaukee.

48. On April 29, 2020, two DTO-related packages were intercepted. Case agents seized one package from FedEx, which package was searched pursuant to a warrant and revealed approximately 9 pounds of marijuana and approximately 237 grams of THC oil, which was packaged in 1-gram quantity plastic containers. Later that same day, UPS, in accordance with UPS policy, opened another box that smelled of marijuana. The package contained approximately 2,029 grams of THC oil, which was also packaged in 1-gram quantity plastic containers. UPS then contacted law enforcement and informed them about the contents of the package.

20

49.     Throughout April 29 and 30, 2020, both PEREZ III and XINA contacted FedEx and UPS numerous times, inquiring about the whereabouts of the packages that had been intercepted

50.     On April 30, 2020, an unknown Hispanic male confronted a UPS driver and asked whether the driver delivered a package to the intended address on April 29, 2020. Upon learning about this incident on May 1, 2020, case agents, with the permission of UPS security, placed an undercover call to PEREZ III and advised PEREZ III that the package that PEREZ III had been calling UPS about for the last two days was damaged in transit and was found to contain suspected controlled substances.  PEREZ III denied the contents contained controlled substances, and the undercover officer informed PEREZ III that, per UPS policy, the package could not be delivered and the contents would be destroyed.

51.     Also on May 1, 2020, while conducting surveillance in the area of the residence to which the seized FedEx package was to be delivered, case agents observed a vehicle, previously observed with PEREZ III, parked a few blocks from the residence. Subsequently, two uniformed Milwaukee Police Department police officers went to the residence and advised the occupants that the police seized a package containing marijuana that was set to be delivered to the residence.  The occupants stated that they did not order a package and denied that the intended recipient lived at the residence. The officers then left the area. Additionally, FedEx marked this package as seized by law enforcement on May 1, 2020.

21

52.     On May 1, 2020, after learning about the interceptions of two packages containing controlled substances, (1) PEREZ III changed the number for the 6730 Phone to (213) 259-9593 (the "9593 Phone"); (2) XINA changed the number for the 9932 Phone to (213) 266-1672 (the "1672 Phone");[1] and (3) SANCHEZ changed the number of the 2991 Phone, to the **0559 Phone**.

I.     **PEREZ III Sending Drug Proceeds to SANCHEZ via U.S. Mail**

53.     United States postal records, post office video surveillance, and court ordered location data from tracking devices on vehicles used by PEREZ III and XINA reflect that PEREZ III and XINA mailed at least 52 packages, believed to contain bulk U.S. Currency, to JULIAN SANCHEZ in California, since December 17, 2019, from the U.S. Post Office located at 5500 S. Howell Avenue, Milwaukee, Wisconsin.

54.     Based upon United States postal records, the majority of packages have been addressed to JULIAN SANCHEZ. Some of the destination addresses have been associated with Julian SANCHEZ in law enforcement database, and some of the destination addresses have been determined to be third party shipping companies that have mailbox rentals.

55.     PEREZ III and XINA use aliases and addresses with no current ties to them to ship the packages. For example, sender names on the packages have

---

[1] Interceptions over PEREZ III and XINA's cell phones continued because PEREZ III and XINA kept same devices and corresponding International Mobile Equipment Numbers.

22

included "Joe Gonzalez" and "Melany Gonzalez." Examples of the sending addresses have included a former address for PEREZ III as well as a Walgreens pharmacy store located on S. Howell Avenue in Milwaukee, Wisconsin.

56. Despite their use of alias and incorrect sending addresses, case agents have confirmed that PEREZ and XINA mailed the above-referenced packages because (1) court ordered location data for their vehicles reflect that their vehicles were stopped in the area of the Howell Avenue post office on dates that correspond to the dates on which some of the packages were mailed; (2) video surveillance has captured PEREZ III and XINA mailing parcels on certain dates, which parcels have been identified as the ones mailed to JULIAN SANCHEZ; and (3) video surveillance has also captured PEREZ III and XINA's vehicles at the post office on dates the correspond to the mailing dates of some of the above-described packages.

57. On April 7, 2020, PEREZ III shipped a parcel to SANCHEZ at 3226 E. Valley View Road, West Covina, California. On April 8, 2020, PEREZ III mailed an additional three packages to SANCHEZ. All four of these packages were scheduled for a 2-3 day delivery.

58. On April 10, 2020, at 1:53 a.m., case agents intercepted an outgoing call from PEREZ III, using the 6730 Phone, to SANCHEZ, using the 2991 Phone. During this conversation, SANCHEZ stated, "Hey I was gonna tell you…my…that shit you send it, it's supposed to be here today and it didn't come." PEREZ III asked, "It didn't get there?" SANCHEZ replied, "No it didn't get there." The conversation continues, and SANCHEZ stated that he has not "tracked it," meaning the package,

23

and stated that he never tracks the packages. PEREZ III told SANCHEZ to "call me back," and the call ended.

59. On April 10, 2020, at 1:54 a.m., case agents intercepted an incoming call to PEREZ III, using the 6730 Phone, from SANCHEZ, using the 2991 Phone. During this conversation, SANCHEZ and PEREZ III discussed when the packages should be arriving. SANCHEZ stated, "I'm looking right now." Case agents believe SANCHEZ was tracking the USPS packages to determine when they would be delivered. PEREZ III stated, "There's one for today and there's two for... there's two. There's three tomorrow." This call coincided with the USPS packages PEREZ III mailed to SANCHEZ on April 7 and April 8, 2020.

60. Based on my training, experience, and knowledge of this investigation, I believe that the above calls reflected that SANCHEZ was concerned because the package hadn't arrived yet. ("Hey I was gonna tell you...my...that shit you send it, it's supposed to be here today and it didn't come."). I further believe that SANCHEZ stated that he was not tracking the packages and that he never tracks the packages that PEREZ III sends. (PEREZ III: "You didn't track it?" SANCHEZ: "No, I didn't track it at all" and "I never track it nigga. I never track the trackings yo."). PEREZ III then confirmed with SANCHEZ that PEREZ III had sent 3 packages. ("There's three tomorrow"). Finally, I believe the packages that PEREZ III and SANCHEZ discussed were packages that contained suspected bulk currency, which constituted payment for controlled substances mailed to PEREZ III.

24

61.     On April 15, 2020, PEREZ III was captured on post office surveillance video at the Howell Avenue branch location mailing two U.S. parcels addressed to JULIAN SANCHEZ in California. Both packages had a label indicating it was from "Joe Gonzalez" with an address of a Walgreens store on S. Howell Avenue in Milwaukee, Wisconsin. On April 16, 2020, these parcels were searched pursuant to sneak and peak warrants. Upon the execution of the search warrants, it was determined that each parcel contained $20,000 in U.S. Currency, for a total of $40,000. The U.S. Currency was concealed in magazines, which were tediously and meticulously taped every few pages with money between each taped section. The magazines were then sealed in plastic bags. Based on my training, experience, and knowledge of this investigation, I believe that this bulk currency constitutes drug proceeds for controlled substances supplied by SANCHEZ to PEREZ III.

62.     On May 2, 2020, PEREZ III, using the 9593 Phone, received an incoming phone call from SANCHEZ, using the **0559 Phone**. SANCHEZ told PEREZ III he was worried PEREZ III had been arrested because PEREZ III wasn't answering the phone. SANCHEZ said, "I'm like, 'What the fuck is going on? This nigga phone off, what the fuck.' I'm like, 'Damn nigga. I hit up your girl, I hit up fucking primo.'" PEREZ III assured SANCHEZ everything was fine, "I'm good dawg, you know your homie dawg." SANCHEZ said, "You were stressing me out nigga, I didn't want to go put the money in the bank and [U/I] nothing nigga." The conversation continued and SANCHEZ asked, "Hey is it 15 or 18-5?" PEREZ III replied, "18,550 dude." SANCHEZ responded, "Okay yeah, I was cutting myself

25

short nigga. I was getting all [U/I] with the 15-5." PEREZ III confirmed it was "18-550" and SANCHEZ said, "Hey dude, what I'mma do, I'm pulling out of the backpack, the 20 for my 18-5 and then um, what was I saying – oh, and then so that new box tomorrow, I'mma open everything tomorrow. Cause I didn't tell you foo, but I got a safe coming right now nigga. I bought a safe for 1150 that's gonna hold everything for us, it's gonna be in my closet. And it's gonna be bolted down to the floor, it's 700 pounds. You heard?"

63. Case agents believed SANCHEZ used the **0559 Phone** to ask PEREZ III how much money was in one of the boxes he received in the mail from PEREZ III. ("Hey is it 15 or 18-5?"). Case agents further believe that PEREZ III informed SANCHEZ that there was $18,550 in the box. Case agents also believe that SANCHEZ told PEREZ III that he is getting a safe that he is going to install in his bedroom. Case agents believe the safe would likely hold proceeds from the sale of controlled substances and/or controlled substances for shipment to PEREZ III. SANCHEZ also told PEREZ III he was going to open the new box tomorrow. Case agents believed this meant SANCHEZ was waiting to open the other boxes of U.S. Currency until he had the aforementioned safe.

64. On May 4, 2020, at 5:44 p.m., SANCHEZ, using the **0559 Phone**, called PEREZ III, using the 9593 Phone. XINA YANG answered PEREZ III's phone and spoke to SANCHEZ. During the conversation, SANCHEZ stated, "Hey can have you have him call me please? Cause this ain't making sense right here." XINA replied, "What aint?" SANCHEZ stated, "This, I got-- it says here 140 but I have

26

133. And then I'm going through all the pages right now." XINA replied, "Nah, it's 140 cause I'm the one that did it." SANCHEZ replied, "Yeah, I'm like looking for the pictures [PH] right now, I'm trying to find them. I'mma show you right now what I got. Can I facetime you?" XINA stated, "Alright." SANCHEZ replied, "I'mma facetime you."

65.      Case agents believe SANCHEZ used the **0559 Phone** to call PEREZ III because some of the money that PEREZ III sent to SANCHEZ via the U.S. Postal Service was missing. PEREZ III sent a total of seven packages to SANCHEZ between April 28, 2020, and April 29, 2020. Case agents believe SANCHEZ was expecting $140,000 and only found $133,000. Case agents believe XINA packaged the money that was sent to SANCHEZ.

66.      Based upon my training, experience, and knowledge of this investigation, I believe that SANCHEZ is supplying controlled substances to PEREZ III, and that PEREZ III is consistently mailing bulk U.S. Currency to JULIAN SANCHEZ to pay for those controlled substances. This is reflected in PEREZ III's use of aliases and false addresses to conceal his identity, the weight of the packages, the intended recipient, and intercepted communications over the **0559 Phone**.

### J.      SANCHEZ's 2991 Phone

67.      On April 22, 2020, United States Magistrate Judge Nancy Joseph for the Eastern District of Wisconsin issued a warrant authorizing the monitoring of the positional data of SANCHEZ's 2991 Phone. Case agents began receiving

27

positional data for the 2991 Phone, which data assisted in locating SANCHEZ's residence. As detailed above, SANCHEZ changed his number on May 1, 2020, in response to law enforcement seizing two packages containing marijuana and THC oil. Case agents believe that the **0559 Phone** is a replacement phone for the 2991 Phone.

### K. SANCHEZ's 9506 Phone

68. During the course of this investigation, the **9506 Phone** has been in contact with two of PEREZ III's predecessor phone numbers (one having been intercepted in the Ohio investigation), PEREZ JR.'s phone number, and the 9932 Phone (XINA's phone). A telephone toll analysis revealed that the **9506 Phone** had 23 common callers with the 2991 Phone (SANCHEZ's predecessor phone number).

69. According to T-Mobile, there is no subscriber information listed for the user of the **9506 Phone**. Case agents are aware that drug traffickers often use "prepay" telephones and regularly do not provide their names for the accounts to evade identification from law enforcement.

70. Based upon the contacts between the **9506 Phone** and PEREZ III DTO members, and based on the common call analysis, case agents believe SANCHEZ is using the **9506 Phone**.

### CONCLUSION

71. Based on their training and experience, case agents know that drug traffickers regularly use multiple telephones to evade law enforcement and conceal their identities. Case agents further believe that drug traffickers often possess cell

phones to remain in constant communication with their customers and suppliers, and that they are in possession of their cell phones when engaging in drug related activities.

72.     Case agents believe SANCHEZ is a source of supply to PEREZ III, and that SANCHEZ resides in the state of California. Case agents further believe that obtaining the locations associated with the **0559 Phone** and the **9506 Phone** will assist in determining when, where and how SANCHEZ facilitates the delivery of controlled substances to PEREZ III. Case agents have been unable to confirm how these controlled substances are being transported to Wisconsin but believe the location data associated with the **0559 Phone** and the **9506 Phone** will assist in revealing this information.

73.     Case agents believe that obtaining location data for the **0559 Phone** and the **9506 Phone** will further assist case agents in monitoring the location of SANCHEZ, identify locations where SANCHEZ obtains and stores controlled substances and U.S. Currency, identify other members of the PEREZ III DTO, and identify the scope and structure of the DTO.

74.     Case agents searched law enforcement databases to confirm that the **0559 Phone** is currently being serviced by Verizon Wireless.

75.     Case agents searched law enforcement databases to confirm that the **9506 Phone** is currently being serviced by T-Mobile.

76.     Case agents are requesting this warrant authorizing the disclosure of data related to the **0559 Phone** and the **9506 Phone** for 30 days to further

29

investigate SANCHEZ's activities, and to identify locations to which SANCHEZ is traveling to further his drug distribution.

77.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

78.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **0559 Phone** and the **9506 Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the

30

communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

79.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **0559 Phone** and the **9506 Phone**, including by initiating

31

a signal to determine the location of the **0559 Phone** and the **9506 Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

## Subscriber Information

80.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **0559 Phone's** and the **9506 Phone's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

81.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

32

82.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

83.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **0559 Phone** and the **9506 Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

84.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days "after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **0559 Phone** and the **9506 Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18

33

U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

85. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **0559 Phone** and the **9506 Phone** outside of daytime hours.

34

## ATTACHMENT A

### Property to Be Searched

1.     Records and information associated with the cellular device assigned

**(213) 700-0559** (referred to herein and in Attachment B as the "**0559 Phone**"), with

subscriber "Louis Perez" that is used by JULIAN SANCHEZ, is in the custody or

control of Verizon Wireless (referred to herein and in Attachment B as the

"Provider"), a wireless communications service provider that is headquartered in

Bedminster, New Jersey.

2.     Prospective E-911/GPS Data latitude-longitude information for the

**0559 Phone**.

1

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned **(562) 380-9506** (referred to herein and in Attachment B as the "**9506 Phone**"), with no subscriber information that is believed to be used by Julian SANCHEZ, is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way Parsippany, New Jersey.

2.      Prospective E-911/GPS Data latitude-longitude information for the **9506 Phone**.

1

## ATTACHMENT B

## Particular Things to be Seized

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **0559 Phone** for the time period October 23, 2019 to the present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

1

Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **0559 Phone** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b. Information associated with each communication to and from the **0559 Phone** for a period of 45 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **0559 Phone** will connect at the beginning and end of each communication

c. Information about the location of the **0559 Phone** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

2

i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **0559 Phone** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

3

## II.      Information to be Seized by the Government

All information described above in Section I that constitutes evidence of (1) distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(l); (2) conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; (3) unlawful use of communications facilities, in violation of 21 U.S.C. § 843(b); (4) laundering of monetary instruments, and conspiracy to do so, in violation of 18 U.S.C. §§ 1956 and 1957; and (5) aiding and abetting the aforementioned offenses, in violation of 18 U.S.C. § 2, involving SANCHEZ.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

## ATTACHMENT B

### Particular Things to be Seized

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a. The following subscriber and historical information about the customers or subscribers associated with the **9506 Phone** for the time period October 23, 2019 to the present:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **9506 Phone** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b. Information associated with each communication to and from the **9506 Phone** for a period of 45 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **9506 Phone** will connect at the beginning and end of each communication

c. Information about the location of the **9506 Phone** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

6

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the **9506 Phone** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of (1) distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(l); (2) conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; (3) unlawful use of communications facilities, in violation of 21 U.S.C. § 843(b); (4) laundering of monetary instruments, and conspiracy to do so, in violation of 18 U.S.C. §§ 1956 and 1957; and (5) aiding and abetting the aforementioned offenses, in violation of 18 U.S.C. § 2, involving SANCHEZ.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.